IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL REIF, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | No.: 06-4761 |
| | : | |
| CNA, et al. | : | |

**MEMORANDUM AND ORDER**

**Juan R. Sánchez, J.**                                                                                        **February 21, 2008**

      Michael and Tammy Reif ask me to grant them leave to take CNA Financial Corp. CEO Stephen W. Lilenthal's deposition and produce all evidence of his alleged ageist 2002 statement delivered during the August 2002 quarterly corporate meeting. The Reifs argue Lilenthal's statement initiated an ageist corporate culture ultimately resulting in Michael Reif's termination. CNA contends the Reifs' request should be denied for two reasons. First, Lilenthal lacks superior or unique personal knowledge to the Reifs' employment or Michael Reif's termination. Secondly, the Reifs have not shown Lilenthal's statement influenced the decision to terminate Michael Reif and that the information could not be obtained from lower level directors or supervisors. Because the Reifs have failed to show Lilenthal's statement influenced the alleged discrimination and lower level employees are more knowledgeable, I will deny the Reifs' request for leave to file a motion to compel without prejudice to its reassertion after the corporate designee deposition and interrogatories.

**FACTS**

      Plaintiffs Michael and Tammy Reif allege Defendants CNA Financial Corp., Continental

1

Casualty Co., CNA Retirement Plan, and John Holladay, discriminated against them because of their age. Michael Reif was terminated in July of 2006, and Tammy Reif alleges she was constructively discharged in January 2007.

In August 8, 2002, CNA Financial Corp.'s new CEO Stephen Lilenthal addressed CNA's employees at the Quarterly Meeting. During his address, he spoke to his employees and commented, "We need to get kids in here." Pl.'s Mot. For Leave to File Mot to Compel Ex. 2 (Web print out Aug 8, 2002). This statement was recorded and possibly transcribed. It is the production of this evidence that initiates the Court's discussion.

The Reifs' third amended complaint alleges Lilenthal's 2002 statement demonstrates a corporate initiative against older workers. They allege this initiative influenced and resulted in Michael Reif's poor evaluations and eventual termination. The Reifs have deposed eight individuals who were directly involved in their employment and Michael Reif's termination, including Michael Reif's immediate supervisor, another supervisor who allegedly decided to terminate Reif, a former Human Resources Consulting Director, and CNA's Vice President of Employee Relations.[1]

Greg Billstone was Michael Reif's immediate supervisor. In his deposition, he stated he was the one who informed Reif he was terminated. He also explained conference calls where Michael Reif's performance and the decision to terminate him was discussed. Billstone was never asked about Lilenthal, Lilenthal's 2002 statement, nor its relevance in Michael Reif's evaluation or termination.

John Holladay was Greg Billstone's supervisor. During his deposition, he was asked about

---

[1] The Reifs have also deposed a former claims manager, one of Reif's former co-workers, one of Michael Reif's former supervisors and claims director, and a second claims director.

Michael Reif's performance and eventual termination. He explained how Billstone followed standard practice and brought Reif's performance deficiencies and performance reviews to Holladay's attention. He also stated he was the one who decided to terminate Michael Reif, discussing this decision with Leslie Curran and Greg Billstone. Holladay stated he reported to regional Vice President Doug Holbrook. Examination of more than 100 pages of deposition testimony also reveals Holladay was never asked about Lilenthal, Lilenthal's 2002 statement, or if Lilenthal's 2002 statement at all influenced him to terminate Michael Reif.

Leslie Curran was a Human Resources Consulting Director when Michael Reif was terminated. She stated how she discussed Michael Reif's employment with Holladay, Billstone, and Liapes. She explained the need to contact EEO compliance once a manager had decided to terminate an employee. She was asked about her teleconferences with Shelley Liapes regarding Michael and Tammy Reif. As with Holladay and Billstone, she was never asked about CEO Lilenthal, Lilenthal's 2002 statement, or if the 2002 statement influenced her discussions regarding Michael Reif's employment. Curran was asked, however, about the relevance of Michael Reif's 2005 EEOC claim in her and Shelley Liapes's conversations regarding his termination.[2]

---

[2] Leslie Curran was asked the following:

> Q. [D]id you and Shelly [sic] discuss the fact that there was a claim of age discrimination pending with the EEOC?
> ......
> A. We had at least one discussion that there was, and what my counsel from her was about dealing with Mike and Tammy is that I was just to treat them as any other employee and not have the fact of the EEOC claim prejudice me in any way against the way I would deal with them, either making – giving them special privileges or the other in reverse. That was always the counsel that I received.

Curran's Dep. 102:12-103:5.

Shelley Liapes, the Vice President of Employee Relations, oversees EEO compliance for all of CNA, and is four people removed from CEO Lilenthal. She answered questions regarding CNA's performance evaluation policies. She stated the individual managers, while responsible for administering the performance management, worked with HR generalists. She also stated job expectations for employees would come from their immediate managers or supervisors.

Liapes discusses how she spoke with Leslie Curran about Michael Reif, but the manager would have been the ultimate decision maker in Reif's termination. Liapes stated she did not speak with Lilenthal regarding Reif's termination, nor has she ever had a personal meeting with Lilenthal. She does remember the 2002 statement mentioning getting younger kids, but does not remember a younger workforce. She remembers Lilenthal focusing on corporate culture and the need to move forward and build corporate culture together. She does not remember seeing any internal messages about Lilenthal's 2002 statement, nor did she know whether a recording or transcript of the statement existed. The Reifs also failed to ask Liapes the relevance of Lilenthal's statement to her discussions regarding Reif's termination.[3]

---

[3] The Court also reviewed the depositions of Beth Downs, a former Claims Director, Eric Thompson, a former supervisor, and Daniel C. Stump, a former co-worker. These individuals were not directly involved with Reif's termination, but they were examined for discussion on Lilenthal's 2002 statement.

Beth Downs was asked of Lilenthal's 2002 statement. She explained she was exposed to the web print out of Lilenthal's statement, but she never really read it. She said she believed one of his messages was "to bridge the gap between the technical talent [they] had and new talent coming in." Downs Dep. 16:9-14. Their challenge as the leadership team "was to develop younger talent and put time into training and education and things like that." *Id.* When asked specifically about Lilenthal's statement regarding "getting kids in here," she interpreted it as his personal introduction to CNA as its new CEO. She interpreted his introduction as him reminiscing about his family, his own kids. Downs also discussed the opening of the Reading Express Center, which was opened shortly after Lilenthal joined CNA. She, like Holladay, reported to Vice President Doug Holbrook and she hired new employees for the Reading Express Center. Some of the new employees were recent college graduates, working alongside employees who had 15 years with CNA. She was never asked if

**DISCUSSION**

Subject to Federal Rule of Civil Procedure 26(b)(2)(C), all non privileged relevant information is discoverable. Relevant information need not be admissible and includes discovery "reasonably calculated to lead to the discovery of admissible evidence." Fed. R. Civ. P. 26(b)(1). Discovery is limited if: it is "unreasonably cumulative or duplicative," or obtainable from a more convenient, less burdensome, or less expensive source; "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action"; or the proposed discovery's burden or expense outweighs its likely benefit. *Id.* at 26(b)(2)(C). In evaluating the discovery's burden and expense, courts consider: the case's needs; the amount in controversy; the parties' resources; the importance of the issues at stake in the action; and the importance of the discovery in resolving the issues. *Id.*

Courts have significant discretion when resolving discovery disputes. *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 778 (3d Cir.2000) (stating a trial court's discovery ruling will only be disturbed if "the court's action made it impossible to obtain crucial evidence, and implicit in such a showing is proof that more diligent discovery was impossible"). In exercising this discretion,

---

Lilenthal's statement motivated her to hiring younger over older workers for the new Reading Center.

Eric Thompson, one of Reif's previous supervisors and one of the Express Center's directors, was asked about Reif's employment. He explained Reif's evaluations in some categories "exceed[ed] requirements." Thompson's Dep. 27:13. He then discussed CNA's performance evaluation and performance management and explained how Reif was not placed on a performance improvement plan while he supervised him. He also shared the details of Reif's evaluations and the ages of other CNA employees. He explained he lacked personal knowledge as to why Reif was terminated. He also stated he had never heard Lilenthal's 2002 statement.

Daniel C. Stump, one of Reif's former co-workers, explained how he was terminated from CNA in 2005 by John Holladay. He then explained how Curran and Holladay discussed his performance deficiencies and how at one point, one insubordination would result in his termination. He also recalled how the Express Center had mostly college graduates. He was never asked about Lilenthal, Lilenthal's 2002 statement, or if he believed this statement influenced his own termination.

courts have prevented and permitted depositions of high-ranking corporate executives. The Third Circuit has yet to decide this issue. The courts which have decided this issue have focused their decisions on whether the executives' possess personal or superior unique knowledge. The courts also consider whether the information could be obtained from lower level employees or through less burdensome means, such as interrogatories.[4] Examining the progression of these requirements and application in different circumstances will guide the Court's discussion regarding the Reifs' discovery dispute.

In *Salter v. Upjohn Company*, the Fifth Circuit affirmed a protective order against the deposition of Defendant Upjohn President Dr. William Hubbard. 593 F.2d 649, 650 (5th Cir. 1979) 650. Plaintiff Susie Salter, as executrix of Rufus Salter's estate, asked to depose Dr. Hubbard regarding Upjohn's testing, marketing, and use of Cleocin, the prescription drug that allegedly killed Rufus Salter. *Id.* at 650-51. In its discretion, the trial court denied Salter's request all three times

---

[4] *Compare  Salter v. Upjohn Company*, 593 F.2d 649 (5th Cir. 1979)(requiring executive to have personal knowledge before allowing plaintiff to depose); *Baine v. General Motors Corp.*, 141 F.R.D. 332, 334 (M.D. Ala. 1991) (denying the plaintiff's request to depose a corporate vice president who lacked unique personal knowledge of the issues); *Harris v. Computer Associates Intern., Inc.*, 204 F.R.D. 44, 46 -47 (E.D.N.Y., 2001) (deposing high level corporate executives may be duplicative, cumulative and burdensome where executive lacks personal knowledge of the disputed events)*; Thomas v. International Business Machines*, 48 F.3d 478, 483 (10th Cir.1995) (barring deposition of corporate executive because he lacked personal knowledge and plaintiff served untimely notice of deposition); *Evans v. Allstate Ins. Co.,*  216 F.R.D. 515, 518-19 (N.D. Okla. 2003), *with  See, e.g., Naftchi v. New York University Medical Center, et al.*, 172 F.R.D. 130 (S.D.N.Y. 1997) (permitting deposition because executive did not assert lack of personal knowledge); *Nyfield v. Virgin Islands Telephone Corp.*, 202 F.R.D. 192 (D.V.I. 2001) (permitting deposition because executive's conduct was at issue and he had personal knowledge).

Some Eastern District of Pennsylvania Courts, however, have ruled against deposing corporate executive because the executives' lacked superior or unique personal knowledge. *See, e.g., Cantor v. The Equitable Life Assurance Soc'y of the United States*, 1998 WL 544962, at *2 (E.D. Pa. Aug.27, 1998); *RCN Corp. v. Paramount Pavilion Group LLC,* 2003 WL 23112381, at *4 (E.D.Pa. Dec.19, 2003); *Koken v. Lexington Ins. Co.,* 2005 WL 6051364, *1 (E.D. Pa. July 18, 2005); *Roman v. Cumberland Ins. Group*, 2007 WL 4893479, *1 (E.D. Pa. Oct. 26, 2007).

because she had to first depose lower level employees with more direct knowledge and she already had a copy of Dr. Hubbard's prepared statement to the United States Senate regarding the same drug. *Id.* 651-52.  The trial court denied her request, but held she could make another request if more information was needed after the initial depositions. *Id.*  The Fifth Circuit affirmed the trial court's "wait and see" approach. *Id.*; *Baine v. General Motors Corp.*, 141 F.R.D. 332, 334-35 (M.D. Ala. 1991).

The Middle District of Alabama District Court adopted *Salter*'s "wait and see" approach when granting a protective order against the deposition of General Motors Vice President Edward H. Mertz. *Baine*, 141 F.R.D. at 335. In their defective seat belt and restraint system law suit against General Motors, Sharon Baine and the other plaintiffs filed notice to depose Mertz and the 18 recipients of an internal memorandum Mertz wrote on his observations "of the performance of a 1978 prototype vehicle's restraint system," and gave the memo to 18 employees. *Id.* at 333. When he wrote the memorandum in 1976, Mertz was involved in the daily engineering activities, but fifteen years later, in 1991 as Vice President, his duties had changed. *Id.* at 333-34. General Motors sought a protective order against all of these depositions because they would be "too burdensome, inconvenient, and duplicative." *Id.* at 333. General Motors also argued the plaintiffs should wait and see what information is needed after deposing the lower level employees and the corporate designee. *Id.* at 334. After analyzing federal case law, the *Baine* Court decided plaintiffs needed to establish Mertz had "superior or unique personal knowledge" to the suit and the lower level employees could not provide the necessary information. *Id.* at 335-36.

In *Thomas v. International Business Machines*, the Tenth Circuit affirmed the granting of International Business Machines' protective order against the deposition of its Chairman John F.

Akers. 48 F.3d 478, 481 (10th Cir.1995). Plaintiff Darlene Thomas moved to depose Akers regarding his "voluntary separation incentive program" named Individual Transition Options (ITO), which allegedly targeted eliminating older employees. *Id.* at 481 and 483. Discovery revealed Thomas's immediate supervisor followed IBM's employee performance rating program and at one point, ranked Thomas within the bottom three employees of the office. *Id.* at 481. Her supervisor encouraged Thomas to participate in ITO because of the imminent reduction in force, but Thomas refused and remained in the office. *Id.* IBM argued against the deposition because Akers lacked personal knowledge of Thomas and the deposition would impose a "severe hardship." *Id.* at 483. The trial court agreed and granted the protective order. The trial court and appellate court acknowledged the potential relevance of Akers' testimony on the ITO program in an ADEA disparate impact case, but Thomas's failure to allege disparate impact in her complaint, her delayed filings of notices to depose, and her failure to first depose immediate supervisors or directors with direct knowledge supported granting the protective order. *Id.* at 483-84.

Like *Baine* and *Thomas*, the *Harris* Court similarly prevented the deposition of Charles Wang, Chairman and CEO of Computer Associates International. *Harris v. Computer Associates Intern., Inc.*, 204 F.R.D. 44, 46-47 (E.D.N.Y. 2001). A week after the discovery deadline expired, Plaintiff Darryl Harris requested additional time to depose Wang. *Id.* at 44-45. When Harris first gave notice of Wang's deposition in the early discovery stage, Computer Associates International initially objected based on "the nature of [Wang's] position with the company and his corresponding lack of involvement with the case." *Id.* at 46. The Court denied Harris's request because of his untimely request and Wang's lack of personal knowledge of Harris's complaint. *Id.* The Court found the burden and expense of deposing Wang would outweigh any potential benefit. *Id.* at 47.

In *Evans v. Allstate Insurance Company*, Defendant Allstate Insurance Company moved for a protective order against the depositions of President and CEO Edward Liddy and Senior Vice President and CFO Dan Hale. 216 F.R.D. 515, 516-17 (N.D. Okla. 2003). Allstate contended these apex officials lacked personal knowledge of the matter and these depositions would prove burdensome given plaintiffs had already deposed all the adjusters and supervisors directly involved with the dispute. *Id.* at 518. Plaintiffs Gary and Schelley Evans argued these depositions were needed to prove Allstate claim adjusters were inadequately supervised, resulting in the mishandling of their policy. *Id.* at 519. The Evans failed to produce case law allowing the deposition of two senior officials under similar circumstances. *Id.* The Court, ultimately relying on *Baine*, expressed the need to prevent oppressive, inconvenient, harassing, and burdensome depositions of executive officials. *Id.* at 518-19. It stated "the oral deposition of a high level corporate executive should not be freely granted when the subject of the deposition will be only remotely relevant to the issues of the case." *Id.* at 519 (citing *Folwell v. Hernandez*, 210 F.R.D. 169, 173-74 (M.D.N.C. 2002) and *Harris*, 204 F.R.D. at 44). In applying these principles, the Court granted the protective order because Liddy and Hale lacked personal knowledge of the Evans' claim and the claim adjusters and supervisors, who were directly involved with the Evans' claim, were better suited to provide the necessary information. *Id.* at 519.

There are circumstances in which courts have permitted depositions of high level executives. In *Nyfield*, the court denied Defendant Virgin Islands Telephone Corp.'s protective order against its CEO Jeffrey Prosser. *Nyfield v. Virgin Islands Telephone Corp.*, 202 F.R.D. 192, 193 (D. Virgin Islands 2001). Plaintiff Larry Nyfield persuaded the court to deny the order because Prosser was an individual defendant and Prosser's decision to transfer Nyfield to another payroll initiated Nyfield's

9

ERISA claim. *Id*. at 193-94. Prosser failed to argue he lacked any personal knowledge of Nyfield's case, thus the Court found the deposition permissible. *Id*. at 194.

In *Nafchti*, Defendant NYU Medical Center moved for a protective order against the deposition of Dr. Saul Farber, Dean and Chairman of NYU School of Medicine's Department of Medicine. *Naftchi v. New York University Medical Center*, 172 F.R.D. 130, 131 (S.D. N.Y. 1997). The *Nyfield* Court analyzed *Nafchti* in its denial of the protective order. The Medical Center argued Dr. Farber did not remember communicating with Plaintiff N. Eric Nafchti in the past ten years and he "did not make decisions concerning plaintiff's salary, research funding, and office or laboratory space." *Id.* at 132. The Court denied the motion and permitted the deposition because Dr. Farber had not averred he lacked personal knowledge. *Id.* at 133. The *Nafchti* Court instructed the Plaintiffs to conclude discovery before permitting Dr. Farber's deposition. *Id*. at 132.

In this case, the Reifs, have deposed numerous supervisors, directors, and former coworkers who were directly involved with the Reifs' employment and/or the decision to terminate Michael Reif. John Holladay, Shelley Liapes, Leslie Curran, and Greg Billstone were directly involved in the decision to terminate Michael Reif. Examining these depositions along with the depositions of Beth Downs, Daniel C. Stump, and Eric Thompson reveals no connection between Lilenthal's 2002 statement and the decision to terminate Michael Reif. Liapes and Curran were asked about the statement's meaning and about how many CNA employees and managers heard the statement. They were never asked, however, whether the statement influenced or motivated their decision to terminate Michael Reif. Neither Holladay, who allegedly decided to terminate Reif, nor Billstone, who immediately supervised Reif and brought Reif's performance to Holladay's attention, were asked anything about Lilenthal's 2002 statement. In fact, neither were asked anything about the year

2002 nor about CEO Lilenthal.[5]

The Reifs argue their failure to ask specific questions should not preclude Lilenthal's deposition or his statement because the discovery stage permits them to explore the facts surrounding this potentially ageist corporate culture. Courts, however, have the discretion to prevent oppressive, harassing, inconvenient, and burdensome depositions of executive officials. Fed. R. Civ P. 26(b)(2)(C); *Evans*, 216 F.R.D. at 519. The Reifs must demonstrate the information can only be obtained from Lilenthal. Lilenthal's statement while remote may be relevant to their case, but the Reifs must show the information cannot "be gathered from other [CNA Financial] personnel." *Thomas*, 48 F.3d at 483 (requiring lower level employee depositions in ADEA case). The Reifs, for instance, failed to ask Liapes, the person closest to Lilenthal, about implementing his values and goals. The depositions, thus far, have failed to demonstrate the deponents lack the information, especially when the pertinent questions have not been asked.[6] Like the plaintiffs in *Baine, Harris, Evans,* and *Salter*, the Reifs must show Lilenthal possessed any special or personal unique knowledge of the Reifs' termination or how his 2002 statement influenced their termination or tenure at CNA Financial Corp.

The Reifs argue Lilenthal's deposition is not burdensome because only Lilenthal, as the declarant of the alleged ageist statement can attest to its purpose as a corporate initiative. They failed, however, to provide case law requiring a deposition from a CEO who lacks unique knowledge

---

[5] The Court is aware Plaintiffs could have become aware of this statement after these depositions. Thus, Plaintiffs could serve these two deponents and others interrogatories regarding the reliance on Lilenthal's 2002 statement when firing Reif.

[6] The Reifs asked Curran the relevance of Michael Reif's EEOC claim during their decision to terminate him. *Citation*. The Reifs could have similarly asked Holladay, Billstone, Curran, and Liapes whether Lilenthal's statement influenced their decision.

11

as to a plaintiff's termination. The Reifs have not demonstrated a nexus between Lilenthal's statement and lower level management's decision to terminate them. *Evans*, 216 F.R.D. at 519. *Compare Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1217 (3d Cir. 1995) (finding managerial comments are relevant to corporate culture); *Ryder v. Westinghouse Corp.*, 128 F.3d 128, 132 (3d Cir. 1997) (admitting ageist comments by Westinghouse executives as relating to formal or informal attitudes); *Lockhardt v. Westinghouse Credit Corp.*, 879 F.2d 43, 54 (3d Cir. 1989)(finding alleged ageist statement by Senior Vice President relevant); *Waldron v. SL Industries*, *Inc.*, 56 F.3d 491 (3d Cir. 1995) (finding alleged ageist comment by a decision maker relevant); *Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988) (affirming admission of University President's racist comment), *with Salter*, 593 F.2d at 649 (requiring plaintiffs to show executive had personal knowledge and lower level employees lacked knowledge prior to permitting executive's deposition); *Thomas*, 48 F.3d at 483 (citing *Salter* requiring plaintiffs to prove executive had superior or unique knowledge before allowing deposition); *Baine*, 141 F.R.D. at 334 (holding executive needed superior or unique knowledge before being deposed); *Harris*, 204 F.R.D. at 46 -47 (requiring plaintiff to depose lower level employees prior to deposing executive with no personal knowledge); *Evans,* 216 F.R.D. at 518-19 (granting protective order against executives' depositions because plaintiffs needed to show executives had personal knowledge).

      The Reifs argue *First Fidelity Bancorporation v. National Union Fire Insurance Company of Pittsburgh*, 1992 U.S. Dist. Lexis (E.D. Pa. Mar. 5, 1992) supports permitting Lilenthal's deposition. Their argument, however, is misplaced because the *First Fidelity* Court permitted the depositions of corporate executives, *only* after the parties demonstrated the insufficiency of interrogatories to the executives or depositions of lower level employees. *Id.* at * 18. The Reifs

must demonstrate the insufficiency of interrogatories or the depositions of the lower level employees before obtaining a deposition of CNA Financial Corp. CEO Lilenthal. The Reifs also cannot rely on *Nyfield* nor *Nafchti*, where the Court permitted depositions of the executives, because CNA has asserted Lilenthal lacks personal knowledge in this case. *Nyfield*, 202 F.R.D. at 192; *Nafchti*, 172 F.R.D. at 130.

Because the Reifs have deposed lower level employees with personal knowledge to Michael Reif's termination, and have yet to depose the corporate designee, deposing Lilenthal, at this time, would be unreasonably repetitive and burdensome. Fed. R. Civ. P. 26(b)(2). Under these circumstances, the burden and expense of Lilenthal's deposition "outweighs its likely benefit," taking into consideration the "importance of the proposed discovery in resolving the issues" in this action. *See* Fed. R. Civ. P. 26(b)(2)(iii); *Harris,* 204 F.R.D. at 46 -47. Deposing CEO Lilenthal at this time would be burdensome and excessive. The Reifs may still avail themselves of other discovery tools such as interrogatory requests to deponents or a 30(b)(6) deposition to establish the necessary nexus between the statement and Reif's termination.

An appropriate order follows.